AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

2019 JUL 23  PM 3: 17

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIV. DAYTON

| In the Matter of the Search of | | |
|---|---|---|
| (Briefly describe the property to be searched or identify the person by name and address) | ) ) ) | Case No. |
| 2201 Homesite Drive, Harrison Township, Montgomery County, Ohio 45414 | ) ) ) | 3:19 mj 406 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 846 | conspiracy to possess with intent to distribute/distribution of controlled substances |
| 21 USC s. 841 | possession with intent to distribute |

The application is based on these facts:

See Attached Affidavit of Andrew McCoy

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Andrew McCoy, TFO of the FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7-23-19

_____
*Judge's signature*

City and state: Dayton, Ohio

Sharon L. Ovington, US Magistrate Judge
*Printed name and title*

# AFFIDAVIT

Your Affiant, Andrew D. McCoy, being duly sworn, does hereby depose and state as follows:

## I.
## INTRODUCTION

1. I am a sworn law enforcement officer in the State of Ohio for over eighteen (18) years. I am presently a sworn member of the Montgomery County Sheriff's Office. I am currently assigned to the Federal Bureau of Investigation's (FBI) Southern Ohio Safe Streets Task Force (SOSSTF) as a Task Force Officer (TFO), I have received training in drug trafficking investigations and have participated in numerous narcotics-related investigations (ultimately leading to successful prosecution) that involved surveillance, gathering evidence of money laundering, interviewing suspected drug traffickers, and supervising the activities of informants who provided information and assistance which resulted in the seizure of narcotics. I have conducted numerous investigations into the unlawful distribution and possession of controlled substances and the use and possession of firearms. Based on my training and experience, I am familiar with federal drug laws, and I am aware that it is a violation of Title 21, United States Code, Sections 841(a)(1) and 846 to knowingly and intentionally distribute and possess with intent to distribute controlled substances (including heroin, fentanyl, and acetyl fentanyl), as well as to conspire to do the same.

## II.
## PURPOSE OF AFFIDAVIT

2. This Affidavit is submitted in support of:

   a. a criminal complaint, and seeks the issuance of an arrest warrant against, **BENJAMIN G. VAUGHN, LEVY K. SMITH IV, JAMES P. EASTERLING** and **NYKIHA D. ASTIN** with conspiracy to possess with intent to distribute and to distribute in excess of 400 grams or more of a mixture or substance containing a detectable amount of fentanyl in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A);

   b. an application for search warrants at the following locations as there is probable cause to believe that evidence of a crime; contraband, fruits of crime or other items illegally possessed; property designed for use, intended for use, or used in committing a crime - namely, 21 U.S.C. Section 846 (conspiracy to distribute and possess with intent to distribute a controlled substance); and 21 U.S.C. Section 841(a)(1) (possession with intent to distribute a controlled substance) - exists and can be found there – namely:

      (1) The residence located at **2201 Homesite Drive, Harrison Township, Montgomery County, Ohio 45414** including any garages, vehicles, storage lockers, cabinets, sheds, closets or outbuildings at this location. **2201 Homesite Drive** is more fully described in Attachment A-1, and Attachment A-1 is incorporated herein by reference.

1

(2) The residence located at **729 North Upland Avenue Apartment #3, Dayton, Ohio 45417**, including any garages, vehicles, storage lockers, cabinets, sheds, closets or outbuildings at this location. **729 North Upland Avenue Apartment #3** is more fully described in Attachment A-2, and Attachment A-2 is incorporated herein by reference

(3) The residence located at **1845 Kipling Drive, Dayton, Ohio 45406**, including any garages, vehicles, storage lockers, cabinets, sheds, closets or outbuildings at this location. **1845 Kipling Drive** is more fully described in Attachment A-3, and Attachment A-3 is incorporated herein by reference.

(4) The residence located at **531 Belmonte Park North Apartment #1009, Dayton, Ohio 45405**, including any garages, vehicles, storage lockers, cabinets, sheds, closets or outbuildings at this location. **531 Belmonte Park North Apartment #1009** is more fully described in Attachment A-4, and Attachment A-4 is incorporated herein by reference.

(5) The residence located at **35 South St. Clair Street Apartment #224, Dayton, Ohio 45402**, including any garages, vehicles, storage lockers, cabinets, sheds, closets or outbuildings at this location. **35 South St. Clair Street Apartment #224** is more fully described in Attachment A-5, and Attachment A-5 is incorporated herein by reference.

c. A list of the specific items to be seized from the premises described above is attached hereto as Attachment B, and Attachment B is incorporated herein by reference. Based on my training and experience, as detailed above, I believe that there is probable cause to believe that the items listed in Attachment B will be found at the premises described above.

d. It should be noted that the information contained in this Affidavit is largely based upon investigations conducted by other law enforcement officers and your Affiant. All of the details of the investigation are not included in this Affidavit, rather only information necessary to establish probable cause of the above-described violations.

e. Unless otherwise noted, when I assert that a statement was made, I received the information from a law enforcement officer who provided the information to me, either verbally or in a written report. The officer providing me with the information may have received the information by way of personal knowledge or from another source.

## III.

## SUMMARY OF PROBABLE CAUSE

3.     In February of 2019, RANGE Task Force Detective Sam Hemingway and the Affiant received information from a confidential source (hereafter referred to as "CS") in regards to Benjamin VAUGHN and Levy SMITH selling large quantities of heroin and/or fentanyl in the Dayton, Ohio area. This CS advised that VAUGHN and SMITH are members of the Diamond Cut Drug Trafficking Organization and are associates of Nykiha ASTIN. The CS stated that VAUGHN and SMITH are running ASTIN's drug trafficking operations in the Dayton area while ASTIN is staying in the Atlanta, Georgia area. The CS provided phone number (937) 529-1760 for SMITH and the phone number (937) 269-1537 for VAUGHN. The CS stated that VAUGHN and SMITH are living in the Saint Clair Lofts located at 35 South Saint Clair Street in the City of Dayton. The CS advised that he/she has been inside of VAUGHN and SMITH's apartment several times, and he/she has personally seen large amounts of heroin and/or fentanyl (multiple ounces) and a money counter inside of the apartment. The CS advised that VAUGHN and SMITH keep the majority of their narcotics, along with several firearms, in the trunk of an abandoned green Ford sedan in the parking lot behind the Saint Clair Lofts. The Affiant showed the CS an overhead aerial map of the Saint Clair Lofts and he/she pointed out where this green Ford is normally parked. The CS stated that VAUGHN and SMITH's apartment is on the second floor of the Saint Clair Lofts but he/she was unsure of the apartment number. The CS later provided Apartment #224 as the apartment that SMITH and VAUGHN are living in. The Affiant considers this CS to be reliable, as the Affiant was able to verify information that the CS provided utilizing independent investigative techniques. The CS is providing information and services to law enforcement in exchange for case consideration.

4. After this initial CS meeting, the Affiant researched the backgrounds of both VAUGHN and SMITH. I found that both VAUGHN and SMITH are on Federal Probation for past narcotics related convictions. VAUGHN's Federal convictions include: Conspiracy to Distribute Crack Cocaine in Excess of 50 grams and Heroin in Excess of 100 grams; Use of a Person Under 18 Years of Age in a Drug Operation (2 counts); Use of a Firearm in Furtherance of a Drug Trafficking Crime. SMITH's Federal convictions include: Convicted Felon in Possession of a Firearm During a Drug Trafficking Crime; Conspiracy to Distribute and Possess With the Intent to Distribute in Excess of 50 Grams of Cocaine Base, Cocaine, and Heroin.

5. The day after the initial CI meeting, Detective Hemingway and the CS drove to the area of the Saint Clair Lofts. The CS pointed out the Saint Clair Lofts as the apartment building where he/she knows VAUGHN and SMITH to have an apartment on the second floor. Upon driving to the rear parking lot of the building, the CS pointed out a green Ford sedan in the rear lot as the vehicle in which he/she knows VAUGHN and SMITH to store narcotics and firearms. After Detective Hemingway drove by the Saint Clair Lofts with the CS, the Affiant checked the rear parking lot of the Saint Clair Lofts and the Affiant located an abandoned green Ford Sedan parked in the same area that the CS had indicated. This vehicle had no license plates on it and the Affiant was unable to get the VIN number, so ownership could not be established.

6. On March 8th, 2019, the CS contacted Detective Sam Hemingway in regards to VAUGHN and SMITH moving their drug processing operation from the Saint Clair Lofts to 729 North Upland Avenue in the City of Dayton. The CS told Detective Hemingway that VAUGHN and SMITH are still storing large amounts narcotics in the trunk of the green Ford sedan at the Saint Clair Lofts,

3

but if they need to "cut" their narcotics, they do so at 729 North Upland Avenue. The CS advised that 729 North Upland Avenue is a 3 unit apartment building and that VAUGHN and SMITH are using the last apartment on the left as a location to process their narcotics.

7. On March 12th, 2019, Detective Sam Hemingway and the Affiant met with the CS who wished to provide updated information on VAUGHN and SMITH. The CS stated that VAUGHN has primarily been staying with a female acquaintance in the Northridge area of Harrison Township, Montgomery County, Ohio, rather than at the Saint Clair Lofts with SMITH. The CS stated that the house where VAUGHN is staying is near the Wendys restaurant off of Needmore Road. The CS also stated that VAUGHN was primarily driving a white Toyota minivan with tinted windows, which the CS believed to be registered to Nykiha ASTIN.

8. On March 13th, 2019, Detective Hemingway located a white 2005 Toyota Sienna minivan bearing Ohio registration HRH6424 parked at 2201 Homesite Drive, Harrison Township, Ohio 45414. This vehicle was found to be registered to Nykiha ASTIN. The residence of 2201 Homesite Drive is located in the Northridge area of Harrison Township as the CS had previously described. A check of the VIN revealed that this is the same vehicle that ASTIN was driving during a controlled purchase of fentanyl conducted by the RANGE Task Force on or about October 24th, 2018.

9. In August of 2018, prior to the beginning of the investigation into Ben VAUGHN and Levi SMITH, Detective Hemingway and the Affiant had conducted a different drug trafficking investigation involving Nykiha ASTIN and Briceston PACKNETT. During the course of this investigation, investigators utilized RANGE Task Force Confidential Informant #1378 to conduct a controlled purchase of fentanyl from Nykiha ASTIN. The Affiant considers this CI to be reliable, as the CI provided information and services to the Affiant that led to the issuance of a Federal search warrant and the seizure of narcotics and firearms. This CI is providing information and services to law enforcement in exchange for case consideration.

10. During the aforementioned controlled purchase, CI #1378 contacted ASTIN by phone at (937) 554-1697 to arrange a purchase of fentanyl. ASTIN directed the CI to 625 Kenilworth Avenue in the City of Dayton to complete the transaction. The CI was driven to 625 Kenilworth Avenue by Ohio State Patrol Investigator P. Beaty, who was acting in an undercover capacity. Shortly after Investigator Beaty and the CI arrived at 625 Kenilworth Avenue, a white 2005 Toyota Sienna minivan bearing Ohio temporary registration H287386 arrived and parked behind Investigator Beaty's vehicle. An unidentified black male subject got out of the Toyota minivan and met with the CI at Investigator Beaty's vehicle. This unidentified black male handed the CI a bag of suspected fentanyl in exchange for serialized RANGE buy funds. The unidentified black male then got back into the Toyota minivan and the minivan left the area. During this controlled purchase, RANGE Task Force Detective S. Humphrey was able to observe that Nykiha ASTIN was the driver of the Toyota minivan.

11. The suspected fentanyl that the CI had purchased was not field tested due to the health risk it posed to law enforcement; however, the suspected fentanyl was packaged in a clear plastic sandwich bag and had an appearance consistent with fentanyl that the Affiant has seen in the past. The suspected fentanyl was packaged and taken to the MCSO Property Room to be held as evidence. A Miami Valley Regional Crime Laboratory lab request was submitted to have the suspected fentanyl tested at the MVRCL. The Affiant later received a lab report from the MVRCL indicating that the suspected fentanyl that the CI purchased from ASTIN had been tested

and was found to be a mixture of Acetyl Fentanyl (Schedule I) and Fentanyl (Schedule II) with a net weight of 8.08 grams (+/- .02 grams).

12.   Upon checking the registration of the white 2005 Toyota Sienna minivan bearing Ohio temporary registration H287386, it was found that this vehicle is registered to Nykiha ASTIN at 531 Belmonte Park North, Dayton, Ohio 45405.  A check of ASTINs Ohio issued driver's license showed his home address listed as 531 Belmonte Park North Apartment #1009, Dayton, Ohio 45405.

13.   During the course of this investigation, the Affiant queried the address of 625 Kenilworth Avenue through the Montgomery County (OH) Auditors property database.  The records showed that in February of 2019, this property was purchased by "Royal Designs and Innovation Housing LLC".  Upon checking this business name through the Ohio Secretary of State database, the Affiant found that "Royal Designs and Innovation Housing LLC" was incorporated in September of 2018, with one Janell Conner being listed as the "Statutory Agent".  The address of Janell Conner is listed as 531 Belmonte Park North Apartment #1009, Dayton, Ohio 45405 on the incorporation documents originally filed with the Ohio Secretary of State.

14.   On March 13th, 2019, the Affiant obtained a search warrant from Montgomery County (Ohio) Common Pleas Court Judge Krumholtz authorizing the installation of a GPS tracking device on the white 2005 Toyota Sienna minivan bearing Ohio registration HRH6424 for a period of sixty (60) days.

15.   On March 14th, 2019, Detective Sam Hemingway and the Affiant were able to successfully install a GPS tracking device on the white 2005 Toyota Sienna minivan bearing Ohio registration HRH6424 as it was parked in the driveway of 2201 Homesite Drive in Harrison Township, Montgomery County, Ohio.

16.   On March 22nd, 2019, the GPS showed that the Toyota minivan was parked at 1845 Kipling Drive. At approximately 1300 hours, Detective Hemingway drove by 1845 Kipling Drive. Detective Hemingway observed the white minivan was parked in the driveway of 1845 Kipling Drive.  Detective Hemingway also observed a white panel van bearing Ohio registration PKG9216 parked in front of the residence. It should be noted that the white panel van bearing Ohio registration PKG9216 had been previously parked in the driveway of 3955 Delphos Avenue in the City of Dayton, during a previous narcotics investigation involving Marks Adams.  Mark Adams is a known Diamond Cut gang member and a close associate of Ben VAUGHN and Levy SMITH.

17.   On April 1st, 2019, the GPS showed that the Toyota minivan was parked at 729 Upland Avenue in the City of Dayton. At approximately 1401 hours, Detective Hemingway drove by 729 Upland Avenue and observed the white Toyota minivan was parked behind the address, near the last door on the end of the building.  Detective Hemingway observed Ben VAUGHN and an unknown male exit the apartment door on the end of the apartment building. Detective Hemingway watched as VAUGHN walked to the white Toyota minivan to get in. A few moments later, Detective Hemingway observed the white Toyota minivan traveling south on Upland. Constant surveillance was kept on the van as it drove directly from 729 Upland Avenue to 1845 Kipling Drive. The Affiant observed the van park in the driveway of 1845 Kipling Drive.  The Affiant then observed VAUGHN exit the van and enter the front door of 1845 Kipling Drive. VAUGHN remained inside of the residence for a short period of time and he then returned to the

white Toyota minivan and departed the area.

18. During the 60 day period that GPS tracking device was installed on the white 2005 Toyota Sienna minivan bearing Ohio registration HRH6424, digital surveillance showed that the vehicle made numerous trips between, and/or parked at, 2201 Homesite Drive in Harrison Township, 729 Upland Avenue in the City of Dayton and 1845 Kipling Drive in the City of Dayton, during various times of the day and night.

19. During the month of May 2019, the Affiant was contacted by FBI S/A Matt Wenker. S/A Wenker advised that he had a confidential informant (hereafter referred to as "CI") who could purchase heroin and/or fentanyl directly from members of the Diamond Cut DTO, to include Nykiha ASTIN, Ben VAUGHN, and Levi SMITH. S/A Wenker considers this CI to be reliable and the Affiant was able to verify information that the CI provided utilizing independent investigative techniques. The CI is providing information and services to law enforcement in exchange for case consideration.

20. During the week of May 27th, 2019, a detailed briefing was held at the RANGE HQ in regards to a controlled purchase of fentanyl from a member or members of the Diamond Cut DTO. Once the briefing was completed, FBI Special Agents Wenker and Buzzard met with an FBI confidential informant to prepare the CI for the controlled buy. At the direction of S/A Wenker, the CI placed a controlled call to the Facebook Messenger account of "Nykiha Dcut Astin" to order an amount of heroin and/or fentanyl. Investigators had previously identified this Facebook profile as possibly belonging to Nykiha ASTIN, as it appears as though ASTIN utilizes this Facebook account to promote various social events and hip hop concerts in and around southwest Ohio. There are also numerous photographs posted to this account which show ASTIN in the company of other Diamond Cut DTO members, including: Ben VAUGHN, Levi SMITH, Mark ADAMS, and Clarence WINN. Upon placing the controlled phone call to the "Nykiha Dcut Astin" Facebook Messenger account, the CI spoke to a male subject who the CI later identified as Nykiha ASTIN. ASTIN asked the CI to provide their cellular telephone number, which the CI did. A short time later, another male subject contacted the CI via cellular phone. The CI advised that he/she recognized the voice of this male subject to belong to Levy SMITH. SMITH directed the CI to go to the "Loft Apartment", which the CI knew to mean the St. Clair Lofts in downtown Dayton. SMITH later changed the meeting location to Upland Avenue, which the CI knew to mean 729 North Upland Avenue in the City of Dayton. While the CI was being prepared for the controlled buy, RANGE Task Force and FBI surveillance units established surveillance on 729 North Upland Avenue in the City of Dayton, as it was believed the controlled buy would occur at that location. Investigators had previously identified 729 North Upland Avenue as a location from which Ben VAUGHN and Levy SMITH traffic narcotics.

21. The CI was searched, outfitted with a wireless transmitter for security purposes, and provided the appropriate amount of serialized FBI buy funds. The CI then departed the meeting location and drove to 729 North Upland Avenue, followed by S/A Wenker and S/A Buzzard. A short time later, the CI arrived at 729 North Upland Avenue. Surveillance units observed the CI pull his/her vehicle to the rear of 729 North Upland Avenue and park in the parking lot on the west end of the building. The CI then entered the westernmost apartment of 729 North Upland Avenue through the front entry door, which faces north. Once the CI was inside of the apartment, S/A Wenker and S/A Buzzard monitored the wireless transmitter that had been hidden on the CI's person. After several minutes, the CI exited the front door of the apartment and left the area in his/her vehicle, followed by S/A Wenker and S/A Buzzard. Wenker and Buzzard then met with

the CI at a prearranged meeting location. The CI was kept under constant surveillance as he/she traveled from 729 North Upland Avenue to the prearranged meeting location.

22. The CI immediately turned over the suspected fentanyl that he/she had just purchased at 729 North Upland Avenue. The CI and his/her vehicle were searched and no other contraband was found on his/her person or in his/her vehicle. S/A Wenker and S/A Buzzard debriefed the CI and the CI confirmed that he/she met with Levy SMITH inside of 729 North Upland Avenue. The CI stated that as far as they could see, SMITH was the only person inside of the apartment during the controlled purchase. The CI advised that while inside of the apartment, he/she gave SMITH the FBI buy funds in exchange for the suspected fentanyl.

23. The suspected fentanyl that the CI had purchased was not field tested due to the health risk it posed to law enforcement; however, the suspected fentanyl was packaged in a clear plastic sandwich bag and had an appearance consistent with fentanyl that investigators have seen in the past. The suspected fentanyl was packaged and taken to the MCSO Property Room to be held as evidence. A Miami Valley Regional Crime Laboratory lab request was submitted to have the suspected fentanyl tested at the MVRCL. The Affiant later received a lab report from the MVRCL indicating that the suspected fentanyl that the CI purchased from SMITH had been tested and was found to be a mixture of Acetyl Fentanyl (Schedule I) and Fentanyl (Schedule II) with a net weight of 83.82 grams (+/- .04 grams).

24. During the week of June 3rd, 2019, a detailed briefing was held at the RANGE HQ in regards to a controlled purchase of fentanyl from a member of members of the Diamond Cut DTO. Once the briefing was completed, the Affiant met with FBI Special Agent Wenker and an FBI CI to prepare the CI for the controlled buy. At the direction of S/A Wenker, the CI had previously arranged to make a controlled purchase of fentanyl from VAUGHN. While the CI was being prepared for the controlled buy, RANGE Task Force and FBI surveillance units established surveillance on 729 North Upland Avenue in the City of Dayton, as it was believed the controlled buy would occur at that location. Investigators had previously identified 729 North Upland Avenue as a location from which VAUGHN and Levi SMITH traffic narcotics.

25. The CI was searched, outfitted with a wireless transmitter for security purposes, and provided the appropriate amount of serialized Homeland Security (HSI) buy funds. Before the CI departed the meeting location, he/she contacted VAUGHN by phone at (937) 620-3044 and the CI was directed to "Westwood". The CI knew this to mean 729 North Upland Avenue in the Westwood neighborhood of Dayton, Ohio. The CI then departed the meeting location and drove to 729 North Upland Avenue, followed by S/A Wenker and Homeland Security Special Agent Rick Hensel. A short time later, the CI arrived at 729 North Upland Avenue. RANGE Task Force Detective Sam Hemingway observed the CI pull his/her vehicle to the rear of 729 North Upland Avenue and park in the parking lot on the west end of the building. A short time later, Detective Hemingway observed VAUGHN arrive at 729 North Upland Avenue in a dark brown 2012 Jeep Grand Cherokee bearing Ohio registration HUB6464. VAUGHN pulled the Jeep Grand Cherokee behind 729 North Upland Avenue and parked near the CI's vehicle. The CS that is assisting investigators with this investigation had contacted the Affiant the previous weekend (June 1st-June 2nd, 2019) and had informed the Affiant that VAUGHN had recently been driving the dark brown 2012 Jeep Grand Cherokee.

26. Once VAUGHN arrived at 729 North Upland Avenue, he and the CI entered the apartment through the front entry door, which faces north. The apartment that VAUGHN and the CI entered

was the westernmost apartment contained within 729 North Upland Avenue. Once VAUGHN and the CI were inside of the apartment, S/A Wenker and S/A Hensel monitored the wireless transmitter that had been hidden on the CI's person. After several minutes, the CI exited the front door of the apartment and left the area in his/her vehicle, followed by S/A Wenker and S/A Hensel. Wenker and Hensel then met with the CI at a prearranged meeting location. The CI was kept under constant surveillance as he/she traveled from 729 North Upland Avenue to the prearranged meeting location.

27. The CI immediately turned over the suspected fentanyl that he/she had just purchased at 729 North Upland Avenue. The CI and his/her vehicle were searched and no other contraband was found on his/her person or in his/her vehicle. S/A Wenker and S/A Hensel debriefed the CI and the CI confirmed that he/she met with VAUGHN inside of 729 North Upland Avenue. The CI stated that as far as they could see, VAUGHN was the only person inside of the apartment during the controlled purchase. The CI advised that while inside of the apartment, he/she gave VAUGHN the HSI buy funds in exchange for the suspected fentanyl.

28. The suspected fentanyl that the CI had purchased was not field tested due to the health risk it posed to law enforcement; however, the suspected fentanyl was packaged in a clear plastic sandwich bag and had an appearance consistent with fentanyl that the Affiant has seen in the past. The suspected fentanyl was packaged and taken to the MCSO Property Room to be held as evidence. A MVRCL lab request was submitted to have the suspected fentanyl tested at the MVRCL. The Affiant later received a lab report from the MVRCL pertaining to the analysis of the suspected fentanyl that the CI had purchase from VAUGHN. The lab report indicated that the substance had been analyzed and no controlled substances were detected.

29. After the controlled purchase, VAUGHN left 729 North Upland Avenue at approximately the same time as the CI did. The RANGE Task Force and FBI surveillance units were able to follow VAUGHN directly from 729 North Upland Avenue to 2201 Homesite Drive in Harrison Township. Detective Hemingway and the Affiant had previously identified 2201 Homesite Drive as a possible residence of VAUGHN and his paramour.

30. During the week of June 10th, 2019, a detailed briefing was held at the RANGE HQ in regards to a controlled purchase of fentanyl from a member or members of the Diamond Cut DTO. Once the briefing was completed, FBI Special Agent Wenker and HSI Special Agent Hensel met with an FBI CI to prepare the CI for the controlled buy. At the direction of S/A Wenker, the CI placed a controlled call to the Facebook Messenger account of "Levi Smith" to order an amount of heroin and/or fentanyl. Investigators had previously identified this Facebook profile as possibly belonging to Levi SMITH, as there are also numerous photographs posted to this account which show SMITH by himself and also in the company of other Diamond Cut DTO members, including: Ben VAUGHN, Mark ADAMS, and Nykiha ASTIN. Upon placing the controlled phone call to the "Levi Smith" Facebook Messenger account, the CI spoke to a male subject who the CI later identified as Levy SMITH. SMITH instructed the CI to call the telephone number, which the CI knew to mean to contact cellular telephone number (937) 620-3044. The CI then called the telephone number and spoke to a male subject. The CI advised that he/she recognized the voice of this male subject to belong to Benjamin VAUGHN. The CI arranged the narcotics deal with VAUGHN and VAUGHN directed the CI to "Uptown", which the CI knew to mean 729 North Upland Avenue in the City of Dayton. While the CI was being prepared for the controlled buy, RANGE Task Force and FBI surveillance units established surveillance on 729 North Upland Avenue in the City of Dayton, as it was believed the controlled

buy would occur at that location. Investigators had previously identified 729 North Upland Avenue as a location from which Ben VAUGHN and Levy SMITH traffic narcotics.

31. The CI was searched, outfitted with a wireless transmitter for security purposes, and provided the appropriate amount of serialized FBI buy funds. The CI then departed the meeting location and drove to 729 North Upland Avenue, followed by S/A Wenker and S/A Hensel. A short time later, the CI arrived at 729 North Upland Avenue. Surveillance units observed the CI pull his/her vehicle to the rear of 729 North Upland Avenue and park in the parking lot on the west end of the building. A short time later, surveillance units observed the CI enter the westernmost apartment contained within 729 North Upland Avenue. Once the CI was inside of the apartment, S/A Wenker and S/A Hensel monitored the wireless transmitter that had been hidden on the CI's person. S/A Wenker and Hensel could hear the CI speaking with another male subject inside of the apartment. After several minutes, another black male subject showed up at 729 North Upland Avenue, driving a maroon 1998 Chevrolet Lumina bearing Ohio registration HRH6157. This subject was later identified as James EASTERLING. Once EASTERLING arrived at the apartment, he made contact with the VAUGHN and the CI. Shortly thereafter, the CI left 729 North Upland, followed by S/A Wenker and S/A Hensel. Wenker and Hensel then met with the CI at a prearranged meeting location. The CI was kept under constant surveillance as he/she traveled from 729 North Upland Avenue to the prearranged meeting location.

32. The CI immediately turned over the suspected fentanyl that he/she had just purchased at 729 North Upland Avenue. The CI and his/her vehicle were searched and no other contraband was found on his/her person or in his/her vehicle. S/A Wenker and S/A Hensel debriefed the CI and the CI confirmed that he/she met with VAUGHN inside of 729 North Upland Avenue. The CI stated that VAUGHN did not have all of the fentanyl that the CI originally ordered, so EASTERLING provided the remaining fentanyl to the CI once he arrived. The CI advised that while inside of the apartment, he/she gave VAUGHN the FBI buy funds in exchange for the suspected fentanyl. The CI advised that VAUGHN gave EASTERLING a portion of this money after EASTERLING gave the CI the remainder of the fentanyl that he/she had ordered.

33. The suspected fentanyl that the CI had purchased was not field tested due to the health risk it posed to law enforcement; however, the suspected fentanyl was packaged in a clear plastic sandwich bag and had an appearance consistent with fentanyl that the Affiant has seen in the past. The suspected fentanyl was packaged and taken to the MCSO Property Room to be held as evidence. A MVRCL lab sheet was submitted to have the suspected fentanyl tested at the MVRCL. The Affiant later received a lab report from the MVRCL indicating that the suspected fentanyl that the CI purchased from VAUGHN and EASTERLING had been tested and was found to be a mixture of Heroin (Schedule I) and Fentanyl (Schedule II) with a net weight of 112.49 grams (+/- .04 grams).

34. After this controlled purchase of fentanyl took place, investigators from the FBI, HSI, and the RANGE Task Force conducted surveillance on the 1998 Chevrolet Lumina, maroon in color, bearing Ohio registration HRH6157 once it left 729 North Upland Avenue after the controlled purchase. While investigators were following the maroon 1998 Chevrolet Lumina after it left 729 North Upland Avenue, it stopped at a business located at or near the intersection on North Gettsyburg Avenue and Queens Avenue in the City of Dayton. The vehicle stopped in the parking lot and the occupants (driver and front seat passenger) exited the vehicle. Detective Fred Zollers positively identified the driver of the vehicle as James EASTERLING. The front seat passenger was later identified as Benjamin VAUGHN. Through previous contacts with

9

EASTERLING, investigators knew EASTERLING to be a convicted felon and known drug trafficker, prohibited from possessing a firearm. After a short time, EASTERLING and VAUGHN got back into the 1998 Chevrolet Lumina, with EASTERLING driving and VAUGHN in the front passenger's seat. The vehicle then left the parking lot of the business and proceeded north on North Gettysburg Avenue.

35. At the direction of investigators, a marked Dayton Police Department cruiser attempted to stop the 1998 Chevrolet Lumina for an equipment violation (window tint) and a marked lanes violation that was witnessed by investigators on North Gettysburg Avenue near Salem Avenue, in the City of Dayton. As soon as the marked cruiser approached the 1998 Chevrolet Lumina from behind, EASTERLING accelerated the vehicle and fled from the marked cruiser before the cruiser had a chance to activate its overhead lights. Surveillance units continued to follow the vehicle, with the assistance of air support. As the vehicle approached the intersection of Valerie Drive and Brookhill Lane in Harrison Township, air support observed an item (later found to be a firearm) being thrown from the vehicle through the front passenger's window. RANGE Task Force Sergeant Terry Ables immediately stopped at this location and observed a Glock 21 .45 caliber handgun serial #WXD723, a broken Glock magazine, and several rounds of .45 caliber ammunition lying in the roadway. Sergeant Ables photographed these items and collected them as evidence.

36. Surveillance units and air support continued to follow the 1998 Chevrolet Lumina until it eventually stopped at 2201 Homesite Drive in Harrison Township. The Affiant knew this location to be the possible residence of Ben VAUGHN. Air support continued surveillance of the vehicle as it stopped in the driveway and EASTERLING and VAUGHN exited. EASTERLING and/or VAUGHN then retrieved an item from the Lumina and placed it into another vehicle that was parked in the driveway of the residence, a silver Range Rover SUV. EASTERLING and/or VAUGHN then pulled the Lumina into the attached garage of the residence and shut the garage door. EASTERLING and/or VAUGHN then retrieved the item that had been removed from the Lumina, from the Range Rover, and took it inside of the residence. A short time later, EASTERLING and VAUGHN exited the residence, got into the silver Range Rover SUV in the driveway, and left the residence. At the direction of investigators, marked Dayton Police Department cruisers stopped this vehicle on Frederick Pike north of Needmore Road in the City of Dayton. EASTERLING and VAUGHN were removed from the vehicle and detained.

37. The Affiant then drafted a State search warrant for the residence of 2201 Homesite Drive, Dayton, OH 45414 and for the 1998 Chevrolet Lumina, maroon in color, bearing Ohio registration HRH6157. Once the Affiant had the search warrant completed, the Affiant met with the Honorable Judge Cynthia Heck of the Vandalia Municipal Court. Judge Heck reviewed and signed the search warrant at 4:36 pm. Once the search warrant was signed, investigators began processing/searching the residence and vehicle. While RANGE Task Force investigators were conducting their search, FBI S/A R. Buzzard and FBI TFO F. Zollers interviewed VAUGHN and EASTERLING at the Butler Township Police Department.

38. Investigators located and seized a large amount of suspected fentanyl, suspected methamphetamine, and U.S currency during the execution of the search warrant. The suspected fentanyl and the U.S currency were located secreted in the basement rafters of the residence, while the suspected methamphetamine was located in a felt bag in the rear seat of the Chevrolet Lumina that EASTERLING had been driving.

39. The suspected fentanyl and methamphetamine that was located during the search warrant was later sent to the Miami Valley Regional Crime Laboratory to be analyzed for content. The Affiant received a lab report from the MVRCL indicating that the suspected fentanyl located in the basement of the residence of 2201 Homesite Drive and the methamphetamine located in the backseat of the vehicle that EASTLERING had been driving had been analyzed. Two of the bags of suspected fentanyl located in the basement were found to be a mixture of Acetyl Fentanyl (Schedule I) and Fentanyl (Schedule II) with a net weight of 57.10 grams (+/- .02 grams) and Fentanyl (Schedule II) with a net weight of 117.78 grams (+/- .02 grams). The suspected methamphetamine located in the vehicle was found to be Methamphetamine (Schedule II) with a net weight of 58.85 grams (+/- .02 grams).

40. After investigators executed the search warrant at 2201 Homesite Drive, Detective Hemingway was contacted by the CS that is assisting law enforcement with this investigation. The CS told Detective Hemingway that shortly after the search warrant was served at 2201 Homesite Drive, Nykiha ASTIN had moved a large amount of narcotics that he had been storing at his apartment at 531 Belmonte Park North, to avoid discovery by law enforcement. The CS stated that he/she was not sure of the apartment number, but he/she knew the apartment to be on the tenth (10th) floor of the building.

41. On June 25, 2019 at approximately 1335 hours, Detective Hemingway was conducting surveillance on 35 South Saint Clair Street, Dayton, Ohio 45402, also known as the "St. Clair Lofts." This address is where Levi SMITH is believed to be residing. During the course of Detective Hemingway's surveillance, he observed Benjamin VAUGHN starting to enter the front door of the St. Clair Lofts, on St. Clair Street. As Detective Hemingway was driving by the front door, VAUGHN paused at the front door and watched Detective Hemingway's vehicle as he passed by. Once Detective Hemingway passed by VAUGHN, Detective Hemingway observed VAUGHN enter the front door of the St. Clair Lofts.

42. During the week of July 1st, 2019, a detailed briefing was held at the RANGE HQ in regards to a controlled purchase of fentanyl from Ben VAUGHN. Once the briefing was completed, HSI Special Agent (S/A) Richard Hensel and FBI S/A Mathew Wenker met with an FBI confidential informant (hereafter referred to as "CI") to prepare the CI for the controlled buy. At the direction of S/A Wenker, the CI had previously agreed to make a controlled purchase of fentanyl from VAUGHN. While the CI was being prepared for the controlled buy, RANGE Task Force and FBI surveillance units established surveillance on 729 North Upland Avenue in the City of Dayton, as it was believed the controlled buy would occur at that location. Investigators had previously identified 729 North Upland Avenue as a location from which VAUGHN and Levy SMITH traffic narcotics.

43. The CI was searched, outfitted with a wireless transmitter for security purposes, and provided the appropriate amount of serialized Homeland Security (HSI) buy funds. Before the CI departed the meeting location, he/she was in contact with VAUGHN by phone at (937) 620-3044 and (937) 269-1537. The CI was directed to a residence on Upland Ave. The CI then departed the meeting location and drove to 729 North Upland Avenue, followed by S/As Wenker and Hensel. A short time later, the CI arrived at 729 North Upland Avenue. RANGE Task Force Detective Sam Hemingway observed the CI pull his/her vehicle to the rear of 729 North Upland Avenue and park in the parking lot on the west end of the building.

44. During the surveillance, prior to the CI arriving at 729 North Upland Avenue, surveillance units observed a Silver Mitsubishi sports utility vehicle (SUV) displaying Michigan licenses plates DZN8922 pull into the small parking lot used by the apartments located at 729 North Upland Avenue. Surveillance units had observed this vehicle drive by the 729 North Upland Avenue at least one time prior to it pulling in the rear parking lot. Shortly after arriving, at the 729 North Upland Avenue parking lot, the Silver Mitsubishi departed and was observed traveling to 3016 Oakridge Avenue in the City of Dayton where it remained until it returned to 729 North Upland Avenue.

45. Upon arriving at the residence, the CI made contact with VAUGHN at the apartment known to be used to distribute narcotics. During the controlled purchase, and while inside the residence, S/A Wenker and Hensel monitored the wireless transmitter that had been hidden on the CI's person. The conversation I overheard was consistent with previous narcotics transactions I have monitored. After several minutes, the CI exited the front door of the apartment and left the area in his/her vehicle, followed by S/A Wenker and S/A Hensel. Wenker and Hensel then met with the CI at a prearranged meeting location. The CI was kept under constant surveillance as he/she traveled from 729 North Upland Avenue to the prearranged meeting location. Just prior to the CI departing, the Silver Mitsubishi returned to the 729 North Upland Avenue location.

46. The CI immediately turned over the suspected fentanyl that he/she had just purchased at 729 North Upland Avenue. The CI and his/her vehicle were searched and no other contraband was found on his/her person or in his/her vehicle. S/A Wenker and S/A Hensel debriefed the CI and the CI confirmed that he/she met with VAUGHN inside of 729 North Upland Avenue. The CI advised that he/she gave VAUGHN the HSI buy funds in exchange for the suspected fentanyl.

47. The suspected fentanyl that the CI had purchased was not field tested due to the health risk it posed to law enforcement; however, the suspected fentanyl was packaged in a clear plastic sandwich bag and had an appearance consistent with fentanyl that I have seen in the past. The suspected fentanyl was packaged and taken to the MCSO Property Room to be held as evidence. A MVRCL lab sheet was submitted to have the suspected fentanyl tested at the MVRCL. The Affiant later received a lab report from the MVRCL indicating that the suspected fentanyl that the CI purchased from VAUGHN had been tested and was found to be Fentanyl (Schedule II) with a net weight of 111.78 grams (+/- .02 grams).

48. After the controlled purchase, VAUGHN left 729 North Upland Avenue in the previously documented Silver Mitsubishi. Surveillance units observed this vehicle as it traveled to 1845 Kipling Drive, Dayton. Where shortly after, surveillance units observed VAUGHN depart the 1845 Kipling Drive, residence and enter the Silver Mitsubishi, at which time, the surveillance was cancelled. A query in government databases revealed that Michigan licenses plates DZN8922 are associated with PV Holdings Corporation (Avis or Budget rental cars). HSI Special Agent Hensel later served a subpoena to the Avis/Budget Group, requesting records in regards to the rental of the 2019 Mitsubishi Eclipse SUV. Avis/Budget Group corporate security later furnished records indicating that this vehicle was rented to Benjamin VAUGHN from June 17th, 2019 to July 17th, 2019.

49. On July 15th, 2019, RANGE Task Force Detective Sam Hemingway received information that Ben VAUGHN would be attending a court appearance at the Dayton Municipal Court for a traffic ticket that he had received. Detective Hemingway and the Affiant then responded to the area of the Dayton Municipal Court in an attempt to locate the 2019 Mitsubishi Eclipse SUV

bearing Michigan registration DZN8922. Detective Hemingway located the vehicle sitting unoccupied in a parking lot directly east of the Montgomery County Sheriff's Office Headquarters building, located at 345 West Second Street in the City of Dayton. RANGE Task Force investigators then set up surveillance on the 2019 Mitsubishi Eclipse SUV bearing Michigan registration DZN8922. A short time later, Detective Hemingway and the Affiant observed Ben VAUGHN get into the driver's seat of the Mitsubishi and drive out of the parking lot.

50. During the week of July 15th, 2019, Detective Hemingway was contacted by the CS that is assisting law enforcement with this investigation. The CS told Detective Hemingway he/she has overheard conversations between ASTIN, VAUGHN, and SMITH that would lead him/her to believe that ASTIN is possibly storing narcotics and/or narcotics-related proceeds (U.S. currency) at ASTINs apartment at 531 Belmonte Park North, to avoid detection by law enforcement. The CS stated that he/she was not sure of the apartment number, but he/she knew the apartment to be on the tenth (10th) floor of the building.

51. During the week of July 15th, 2019, a detailed briefing was held at the RANGE HQ in regards to a controlled purchase of fentanyl from Ben VAUGHN. Once the briefing was completed, RANGE Task Force Detective Sam Hemingway and FBI S/A Mathew Wenker met with an FBI CI to prepare the CI for the controlled buy. At the direction of S/A Wenker, the CI had previously arranged to make a controlled purchase of fentanyl from VAUGHN. While the CI was being prepared for the controlled buy, RANGE Task Force and FBI surveillance units established surveillance on 729 North Upland Avenue in the City of Dayton, as it was believed the controlled buy would occur at that location. Investigators had previously identified 729 North Upland Avenue as a location from which VAUGHN and Levy SMITH traffic narcotics.

52. While Detective Hemingway and S/A Wenker were meeting with the CI, RANGE Task Force surveillance units established surveillance on the 2019 Mitsubishi Eclipse SUV bearing Michigan registration DZN8922, which was parked at 2201 Homesite Drive in Harrison Township, Montgomery County, Ohio.

53. The CI was searched, outfitted with a wireless transmitter for security purposes, and provided the appropriate amount of serialized FBI buy funds. Before the CI departed the meeting location, he/she was in contact with VAUGHN by phone at (937) 620-3044. The CI was directed to a residence on Upland Ave. The CI then departed the meeting location and drove to 729 North Upland Avenue, followed by S/As Wenker and Hensel. At approximately the same time this phone call was made, Ben VAUGHN left 2201 Homesite Drive, driving the 2019 Mitsubishi Eclipse SUV bearing Michigan registration DZN8922. Investigators were able to follow VAUGHN as he traveled from 2201 Homesite Drive directly to 729 North Upland Avenue. A short time later, the CI arrived at 729 North Upland Avenue. Surveillance units observed the CI pull his/her vehicle to the rear of 729 North Upland Avenue and park in the parking lot on the west end of the building.

54. Upon arriving at the residence the CI made contact with VAUGHN at the apartment known to be used to distribute narcotics. During the controlled purchase, while the CI was inside of the residence, the Affiant monitored the wireless transmitter that had been hidden on the CI's person. The conversation that the Affiant overheard was consistent with previous narcotics transactions that the Affiant has monitored. After several minutes, the CI exited the front door of the apartment and left the area in his/her vehicle, followed by S/A Wenker and Detective

Hemingway. Wenker and Hemingway then met with the CI at a prearranged meeting location. The CI was kept under constant surveillance as he/she traveled from 729 North Upland Avenue to the prearranged meeting location. Shortly after the CI left 729 North Upland Avenue, VAUGHN was observed exiting the front door of the apartment and getting into the driver's seat of the 2019 Mitsubishi Eclipse SUV bearing Michigan registration DZN8922. Surveillance units were able to follow VAUGHN as he drove from 729 North Upland Avenue back to 2201 Homesite Drive.

55. Upon meeting with S/A Wenker and Detective Hemingway, the CI immediately turned over the suspected fentanyl that he/she had just purchased at 729 North Upland Avenue. The CI and his/her vehicle were searched and no other contraband was found on his/her person or in his/her vehicle. S/A Wenker and Detective Hemingway debriefed the CI and the CI confirmed that he/she met with VAUGHN inside of 729 North Upland Avenue. The CI advised that he/she gave VAUGHN the FBI buy funds in exchange for the suspected fentanyl.

56. The suspected fentanyl that the CI had purchased was not field tested due to the health risk it posed to law enforcement; however, the suspected fentanyl was packaged in a clear plastic sandwich bag and had an appearance consistent with fentanyl that the Affiant has seen in the past. The suspected fentanyl was packaged and taken to the MCSO Property Room to be held as evidence. A MVRCL lab sheet was submitted to have the suspected fentanyl tested at the MVRCL. The Affiant later received a lab report from the MVRCL indicating that the suspected fentanyl that the CI purchased from VAUGHN had been tested and was found to be Fentanyl (Schedule II) with a net weight of 55.49 grams (+/- .02 grams).

57. On July 17th, 2019, the Affiant was contacted by the CS that is assisting law enforcement with this investigation. The CS advised that VAUGHN had returned the 2019 Mitsubishi Eclipse SUV bearing Michigan registration DZN8922 to the car rental location and he had rented a silver Kia Soul with Ohio license plates in its place. The Affiant requested Montgomery County Sheriff's Office Deputy Jennifer Parrot to check 2201 Homesite Drive in Harrison Township for any possible rental cars parked at the residence. Deputy Parrot advised that there was a silver 2019 Kia Soul bearing Ohio registration HSU2362 parked in the driveway of the home. A query in government databases revealed that Ohio registration HSU2362 are associated with PV Holdings Corporation (Avis or Budget rental cars).

58. While the Affiant was speaking with the CS, the CS also told the Affiant that Nykiha ASTIN was currently in Dayton for business purposes. The Affiant asked the CS where ASTIN stays while he is in Dayton, and the CS told the Affiant that ASTIN stays with a female that the CS knows as "Janell". The CS advised that "Janell" lives at 531 Belmonte Park North on the tenth (10th) floor of the building.

59. On July 18th, 2019, the Affiant served an HSI subpoena to Dayton Power and Light, requesting DP&L account information for several addresses associated with this investigation, including:
- 531 Belmonte Park North Apartment #1009, Dayton, Ohio 45405
- 35 South St. Clair Street Apartment #224, Dayton, Ohio 45402

60. Upon receiving the requested records from Dayton Power and Light, the Affiant found that the DP&L account at 531 Belmonte Park North Apartment #1009 is in the name of Janell Conner. As previously stated in this affidavit, Janell Conner, with an address of 531 Belmonte Park North Apartment #1009, Dayton, Ohio 45405, is listed as the "Statutory Agent" of "Royal

Designs and Innovation Housing LLC" in the Ohio Secretary of State business records. "Royal Designs and Innovation Housing LLC" is listed as the owner of 625 Kenilworth Avenue, Dayton, Ohio in the Montgomery County (OH) Auditors property database. A controlled purchase of fentanyl from Nykiha ASTIN took place at 625 Kenilworth Avenue, Dayton, Ohio on October 24th, 2018. ASTIN also carries 531 Belmonte Park North Apartment #1009, Dayton, Ohio 45405 as his home address on his State of Ohio driver's license.

61. The Affiant found that the DP&L account at 35 South St. Clair Street Apartment #224, Dayton, Ohio 45402 in is the name of Levy SMITH. As previously stated in this affidavit, SMITH is a known member of the Diamond Cut DTO and he sold a large amount of fentanyl to a confidential informant during the week of May 27th, 2019. Also, the CS that is assisting law enforcement with this investigation stated that SMITH lives at 35 South St. Clair Street Apartment #224, Dayton, Ohio and that he/she has personally seen large amount of heroin and/or fentanyl, along with a money counter, inside of this apartment.

62. Based on my training and experience, I know that individuals engaged in drug trafficking commonly maintain locations known as stash houses. At these locations, they maintain the tools of their drug trade, including, but not limited, to the items listed in the paragraphs below. As detailed above, agents observed VAUGHN, SMITH and/or EASTERLING coming from or going to some of the various proposed search locations immediately prior to or immediately after several of the controlled purchases. Based on this pattern of activity described above, in conjunction with information provided by a CS, the proposed search locations– namely, **2201 Homesite Drive, Harrison Township, Montgomery County, Ohio; 729 North Upland Avenue Apartment #3, City of Dayton, Montgomery County, Ohio; 1845 Kipling Drive, City of Dayton, Montgomery County, Ohio; 531 Belmonte Park North Apartment #1009, City of Dayton, Montgomery County, Ohio; and 35 South St. Clair Street Apartment #224, City Of Dayton, Montgomery County, Ohio**- appear to be stash houses where VAUGHN, SMITH, EASTERLING, and ASTIN store cash, controlled substances, and other tools of the drug trade.

63. It has been the experience and training of your affiant that narcotics traffickers are often armed with firearms to protect their ongoing criminal business activities; and that they often store the illegal products they sell at the location where they are conducting their illegal business. Narcotics traffickers receive payment for controlled substances in cash and frequently accumulate large quantities of cash as a result. Narcotics traffickers also frequently use scales and packaging materials, such as glassine bags, sandwich bags, and coin envelopes as packaging materials for the distribution of controlled substances. Narcotics traffickers frequently accumulate supplies of these packaging materials in their residences and the places from which they distribute controlled substances. Narcotics traffickers also frequently maintain records of customers and sales, telephone numbers of customers, tools for trafficking in drugs, and sources of supply in their residences, even if they conduct their transactions by vehicle or at other physical locations. These items can also be found in the places from which they distribute or store controlled substances.

64. Based on the aforementioned facts and circumstances contained in this affidavit, my training and experience, and conversations with other law enforcement Officers, your Affiant believes that certain evidence is presently concealed in the residences described above, including but not limited to:

   a. Illegal narcotics/controlled substances and related narcotics paraphernalia;

   b. Cellular telephones, pagers, scales, packaging materials, and storage containers which are property designed or intended for use or which is or has been used as the means of committing a criminal offense;

   c. Assets such as United States currency, money drafts, real estate drafts, financial instruments, including stocks and bonds representing the proceeds of the distribution of controlled substances; jewelry;

   d. Correspondence, books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase and distribution of controlled substances;

   e. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

   f. Corresponding books, records, receipts, notes, ledgers, and other papers relating to the activities of VAUGHN, SMITH, EASTERLING, ASTIN and others involved in distributing controlled substances

   g. Records relating to income and expenditures of money and wealth, including but not limited to money orders, wire transfers, cashier's checks, receipts, bank statements, passbooks, checkbooks, and check registers; Bank account records, safe deposit box records, wire transfer records, bank statements, escrow accounts, address books, and paychecks;

   h. Indicia of occupancy, residency, rental and/or ownership of a premises, including, but not limited to mail, utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements;

   i. Documents indicating interstate and/or foreign travel such as travel itineraries, plane tickets, boarding passes, motel and hotel rental records, passports, and visas, credit card receipts, and telephone bills, rental car information;

   j. Firearms, ammunition, any firearms parts or accessories and any records or receipts pertaining to firearms and ammunition;

   k. Computer disk and diskettes, computer hardware and software containing records of financial or drug-related transactions involving the individuals and/or businesses they are associated with in any way;

l.   Photographs, including still photos, negatives, video tapes, films, underdeveloped film and the contents therein, slides, in particular photographs of potential co-conspirators, assets and/or controlled substances.

Based on the facts set forth in the Affidavit, the Affiant believes there is probable cause to issue:

a.   criminal complaints against, and arrests arrest warrants for, **BENJAMIN G. VAUGHN, LEVY K. SMITH IV, JAMES P. EASTERLING** and **NYKIHA D. ASTIN** for conspiracy to possess with intent to distribute and to distribute in excess of 400 grams or more of a mixture or substance containing a detectable amount of fentanyl in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A);

b.   search warrants at the following locations as there is probable cause to believe that evidence of a crime; contraband, fruits of crime or other items illegally possessed; property designed for use, intended for use, or used in committing a crime - namely, 21 U.S.C. Section 846 (conspiracy to distribute and possess with intent to distribute a controlled substance); and 21 U.S.C. Section 841(a)(1) (possession with intent to distribute a controlled substance) - exists and can be found there – namely:

(1)  The residence located at **2201 Homesite Drive, Harrison Township, Montgomery County, Ohio 45414** including any garages, vehicles, storage lockers, cabinets, sheds, closets or outbuildings at this location. **2201 Homesite Drive** is more fully described in Attachment A-1, and Attachment A-1 is incorporated herein by reference.

(2)  The residence located at **729 North Upland Avenue Apartment #3, Dayton, Ohio 45417**, including any garages, vehicles, storage lockers, cabinets, sheds, closets or outbuildings at this location.  **729 North Upland Avenue Apartment #3** is more fully described in Attachment A-2, and Attachment A-2 is incorporated herein by reference

(3)  The residence located at **1845 Kipling Drive, Dayton, Ohio 45406**, including any garages, vehicles, storage lockers, cabinets, sheds, closets or outbuildings at this location.  **1845 Kipling Drive** is more fully described in Attachment A-3, and Attachment A-3 is incorporated herein by reference.

(4)  The residence located at **531 Belmonte Park North Apartment #1009, Dayton, Ohio 45405**, including any garages, vehicles, storage lockers, cabinets, sheds, closets or outbuildings at this location. **531 Belmonte Park North Apartment #1009** is more fully described in Attachment A-4, and Attachment A-4 is incorporated herein by reference.

17

(5)  The residence located at **35 South St. Clair Street Apartment #224, Dayton, Ohio 45402**, including any garages, vehicles, storage lockers, cabinets, sheds, closets or outbuildings at this location. **35 South St. Clair Street Apartment #224** is more fully described in Attachment A-5, and Attachment A-5 is incorporated herein by reference.


Further your Affiant sayeth naught.


Andrew D. McCoy, Task Force Officer
Federal Bureau of Investigation
Southern Ohio Safe Streets Task Force


Subscribed and sworn to before me this _23rd_ day of July, 2019.


Honorable Sharon Ovington
United States Magistrate Judge

**ATTACHMENT A-1**

Description of property to be searched

The property is a single family residence, situated on the north side of Homesite Drive, between North Dixie Drive and Payne Avenue in Harrison Township. The residence is constructed of red brick, with black shutters, a brown roof, and a white front door which faces south. The numbers "2-2-0-1" are displayed to the right of the front door in light colored numerals on a black placard. This single family residence is located at 2201 Homesite Drive, Harrison Township, Montgomery County, Ohio 45414.



Target Residence

ATTACHMENT B

I submit that there is probable cause to search for the following items:

A.   Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B.   Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C.   Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D.   Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E.   Electronic equipment such as pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios.

F.   United States currency, precious metals, coins bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G.   Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

H.   Indicia of occupancy, residency, and/or ownership of the premises, and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, vehicle registrations and documentation regarding storage units/lockers.

I.   Illegal drugs, including, but not limited to fentnayl, heroin and other controlled substances, and other tools used in the drug trade, including, but not limited to, scales, vacuum sealers, packaging material, presses, razor blades and cutting agents.

J.   Firearms and ammunition.

K.   Any computers, cellular telephones, tablets or electronic devices that may contain the above-described documents or items in electronic format.

L.      Text messages, instant messages and the like that concern or relate to drug trafficking activity, including, but not limited to, sale prices, drug quantities, customers, sources of supply, or storage locations,